# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS

| | |
|---|---|
| THEODORE W. OLSZANSKI, Derivatively on Behalf of DIGITAL TURBINE, INC. <br><br> Plaintiff, <br><br> vs. <br><br> WILLIAM GORDON STONE, III, ROB DEUTSCHMAN, ROY H. CHESTNUTT, HOLLY HESS GROOS, MOHAN GYANI, JEFF KARISH, MICHELLE M. STERLING, MOLLIE SPILMAN <br><br> Defendants, <br><br> and <br><br> DIGITAL TURBINE, INC. <br><br> Nominal Defendant. | Case No.  1:22-cv-911 <br><br> **DEMAND FOR JURY TRIAL** |

## <u>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT</u>

Plaintiff Theodore W. Olszanski ("Plaintiff") by his attorneys hereby submits this Verified Shareholder Derivative Complaint (the "Complaint") against Defendants (defined below) named herein. Plaintiff alleges the following on information and belief, except as to the allegations specifically pertaining to Plaintiff, which are based on personal knowledge. This Complaint is also based on the investigation of Plaintiff's counsel, which included a review of, among other things, public filings with the U.S. Securities and Exchange Commission ("SEC"), news reports, press releases, related litigation and other public sources.

**SUMMARY OF THE ACTION**

1.      This is a stockholder derivative action brought for the benefit of Digital Turbine, Inc. ("Digital Turbine" or the "Company")  against Defendants for breaches of their fiduciary duties owed to the Company.

2.      According to its SEC filings, Digital Turbine touts itself as a leading, independent mobile growth platform that levels up the landscape for advertisers, publishers, carriers, and device original equipment manufacturers ("OEMs"). The Company offers end-to-end products and solutions leveraging proprietary technology to all participants in the mobile application ecosystem, enabling brand discovery and advertising, user acquisition and engagement, and operational efficiency for advertisers.

3.      During 2021, the Company completed the acquisitions of AdColony Holding AS ("AdColony") and Fyber, N.V. ("Fyber") to execute on its strategy of becoming a leading end-to-end solution for mobile brand acquisition, advertising, and monetization. These acquisitions significantly enlarged the size and scope of the Company's business.

4.      As a result of these acquisitions referenced above, the Company identified a material weakness in its internal controls over financial reporting related to the presentation of certain revenue net of license fees and revenue share expense and the classification of certain hosting costs.  Thus, the Company's internal controls over financial reporting and disclosure controls and procedures were not effective as of March 31, 2022.  The Company is still evaluating internal controls over the AdColony and Fyber acquisitions and integrating them into the Company's existing operations. Thus, these acquisitions were excluded from the Company's assessment of internal control over financial reporting as of March 31, 2022.

5.      During the fourth quarter of the fiscal year ended March 31, 2022, the Company determined it would be necessary to complete a more comprehensive review of revenue accounting for its recently acquired businesses, including Fyber and AdColony. As a result of that review, management determined the Company acted as an agent, rather than as a principal, in certain product lines of the recently acquired businesses and, as a result, revenue for those product lines should have been reported net of license fees and revenue share expense.

6.      In addition, as part of the continued integration of the recently acquired businesses, management determined the presentation and disclosure of certain hosting costs had not been conformed to our corporate accounting policy. As a result, certain hosting costs were classified as product development expenses rather than other direct costs of revenue and general and administrative expenses.  Management concluded the Company's internal controls for business combinations did not include a control adequately designed to ensure acquiree accounting policies, as they relate to presentation and classification, were conformed to those of the Company and GAAP.

7.      Ultimately, on May 17, 2022, the Company announced that it would restate its financial statements for the three-month period ended June 30, 2021, the three and six-month periods ended September 30, 2021, and the three and nine-month periods ended December 31, 2021. The restatements of the previously filed financial statements were due to an error in the presentation of revenue for certain product lines, as well as the classification of certain hosting costs for the Company's acquisitions of AdColony and Fyber. As part of the post-acquisition integration process, the Company initially assessed the accounting policies of these acquisitions and determined the Company acted as a principal in the revenue arrangements. As a result, revenue was reported gross, exclusive of license fees and revenue share expense.

8.      The Company has an egregious history of failing to maintain internal controls over financial reporting.  This is the direct responsibility of the Defendants, including the Board of Directors. In 2019, the Company was charged by the SEC for violating federal securities laws in connection with the Company's failure to create and implement effective internal controls over financial reporting for ***seven consecutive annual reporting periods*** from fiscal year 2011 through fiscal year 2017.  The SEC found that the Company reported material weaknesses year after year. Furthermore, the SEC noted the Company's delay in remediating its material weaknesses, which did not fully occur until the end of fiscal year 2018.   As a result, the SEC found that the Company violated federal securities laws and the Company was ordered to pay a civil money penalty of $100,000 to the SEC.  As detailed further herein, the Board members who failed to review and evaluate the major risks facing the Company during this time make up the majority of the Company's current Board and continue to serve as directors.  No one has been held accountable.

9.      Defendants approved and allowed the Company to issue numerous SEC filings that failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose: (1) that the Company's recent acquisitions, AdColony and Fyber, act as agents in certain of their respective product lines; (2)  that, as a result, revenues for those product lines must be reported net of license fees and revenue  share, rather than on a gross basis; (3) that the Company's internal controls over financial reporting as to revenue recognition was deficient; and (4) that, as a result of the foregoing, the Company's net revenues were overstated throughout fiscal 2022 which rendered Defendants' positive statements about the Company's business, operations, and prospects materially misleading.

10.    Additionally, Defendants' misconduct has subjected the Company, its Chief Executive Officer ("CEO"), and its Chief Financial Officer ("CFO") to several civil federal securities fraud class action lawsuits (collectively, the "Securities Class Actions").

11.    Furthermore, the Company is now required to expend its resources to implement another extensive remediation plan to improve its internal controls over financial reporting.  The Company has also suffered massive losses from the waste of corporate assets as a result of the unjust enrichment of Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein as a result of the falsely inflated financial results.

## JURISDICTION AND VENUE

12.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 10(b) of the Exchange Act, 15. U.S.C.§ 78j(b), and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Actions based on violations of the Exchange Act.

13.    This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332. Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds the sum or value of $75,000 exclusive of interest and costs.

14.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant  to 28 U.S.C. § 1367(a).

15.    This shareholder derivative action is not a collusive action to confer jurisdiction on a court of  the United States that it would not otherwise have.

16.     Venue is proper in this District because a substantial portion of the transactions and wrongs complained of herein occurred in this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

17.     Plaintiff is and was at all relevant times a shareholder of Nominal Defendant, Digital Turbine.  Plaintiff is a citizen of the State of Michigan.

18.     Nominal Defendant Digital Turbine is a Delaware corporation with its headquarters located at 110 San Antonio Street, Suite 160, Austin, Texas 78701.

19.     Defendant Rob Deutschman ("Deutschman") has been a director since May 2013 and has served as Chair of the Board since December 2014.  He is a member of the Audit and Governance and Nominating Committees.  Upon information and belief, Defendant Deutschman is a citizen of California.

20.     Defendant Roy H. Chestnutt ("Chestnutt") has served as a director since June 2018. Defendant Chesnutt is a member of the Audit Committee.   Upon information and belief, Defendant Chestnutt is a citizen of New York.

21.     Defendant Holly Hess Groos ("Groos") has served as a director since May 2021 and is Chair of the Audit Committee.  Upon information and belief, Defendant Groos is a citizen of New York.

22.     Defendant Mohan Gyani ("Gyani") has served as a director since January 2016 and is a member of the Compensation Committee and Chair of the Governance and Nominating Committee.   Upon information and belief, Gyani is a citizen of California.

23.     Defendant Jeff Karish ("Karish") has served as a director since May 2013 and is the Chair of the Compensation Committee.  Upon information and belief, Defendant Karish is a citizen of California.

24.     Defendant Michelle M. Sterling ("Sterling") has served as a director since June 2019 and is a member of the Compensation and Governance and Nominating Committees. Upon information and belief, Defendant Sterling is a citizen of California.

25.     Defendant Mollie Spilman ("Spilman") has served as a director since February 2022 and is a member of the Compensation Committee. Upon information and belief, Defendant Spilman is a citizen of Maryland.

26.     Defendant Bill Stone ("Stone") has served as the Company's CEO since October 2014 and appointed to the Board in January 2015.   Stone served as the Company's President and Chief Operating Office from November 2013 until his appointment as CEO.  Upon information and belief, Defendant Stone is a citizen of Texas.

27.     Defendants Deutschman, Chestnutt, Groos, Gyani, Karish, Sterling, Spilman and Stone are collectively referred to herein as the "Defendants" or the "Individual Defendants."

**FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

28.     By virtue of their positions as officers and directors of Digital Turbine, and because of their ability to oversee, direct, and control the business and corporate affairs of  Digital Turbine, Defendants owed Digital Turbine and its stockholders fiduciary obligations of good faith, loyalty, and candor, and they were required to do their  utmost to control and manage Digital Turbine in a fair, just, honest, and equitable  manner. Defendants were required to act in the best interests of Digital Turbine  and its stockholders and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to Digital Turbine and its stockholders  the fiduciary duty

to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets. Defendants' neglect of their duties to the Company in essence decimated their duty of oversight.

29.     Defendants, because of their positions of control and authority as directors or officers of Digital Turbine, directly or indirectly exercised control over the wrongful acts complained of herein. Because of their advisory, executive, managerial and directorial positions within Digital Turbine, each of the Defendants had knowledge of material, nonpublic information regarding the Company.

30.     In the discharge of their duties, Defendants were required to exercise reasonable and prudent supervision over management, policies, practices, and controls of the financial affairs of Digital Turbine. Digital Turbine represents that its directors are expected to spend the time and effort necessary to properly discharge their responsibilities, which specifically include:

- exercising their business judgment in good faith;

- acting in what they reasonably believe to be the best interest of all stockholders;

- becoming and remaining well-informed about the Company's business and operations and general business and economic trends affecting the Company;

- and ensuring that the business of the Company is conducted so as to further the long-term interests of its stockholders.

31.     Digital Turbine's Directors are also responsible for overseeing its risk management process, focusing on general risk management strategy, the most significant risks facing the Company, and overseeing the implementation of risk mitigation strategies by management. According to the Audit Committee Charter and Digital Turbine's public SEC filings, the Audit Committee owed several additional duties to Digital Turbine. The Audit Committee is responsible

for, among other things, fulfilling its oversight responsibilities by reviewing the financial information provided to shareholders and others, the systems of internal controls which management and the Board have established, and the Company's audit and financial reporting process. The Audit Committee is also responsible for reviewing the adequacy and effectiveness of the Company's accounting and internal control policies and procedures on a regular basis, through inquiry and discussions with the Company's independent auditors and management.

32.     Thus, the oversight of Digital Turbine's internal and disclosure controls as well as the risks involved with the Company's acquisitions, fell squarely within the direct oversight responsibilities of the Digital Turbine Board and its Audit Committee.

### SUBSTANTIVE ALLEGATIONS

**Background of the Company and Its History of Failing to Maintain Internal Controls Over Financial Reporting**

33.     Digital Turbine touts itself as a leading independent mobile growth platform. Through its subsidiaries, the Company simplifies content discovery and delivers it directly to mobile devices.

34.     In 2019, the Company was charged by the SEC for violating federal securities laws in connection with the Company's failure to create and implement effective internal controls over financial reporting for ***seven consecutive annual reporting periods*** from fiscal year 2011 through fiscal year 2017.

35.     The Company's material weaknesses resulted from, among other things, deficiencies in the design and operation of controls related to its financial close and reporting process, including, during certain periods of time, weaknesses around the review and performance of reconciliations during the close process; and failures to maintain sufficient qualified personnel or adequate

accounting information technology systems resulting in a manual close with insufficient documentation of the procedures employed.

36.     Specifically, the SEC found that the Company reported material weaknesses year after year.  The SEC further noted the Company's delay in remediating its material weaknesses after being contacted by the SEC.  Remediation did not fully occur until the end of fiscal year 2018.  As a result, the SEC found that the Company violated both the general statutory requirement to maintain sufficient internal accounting controls (Exchange Act Section 13(b)(2)(B)) and the specific regulatory requirement to maintain ICFR (Rule 13a–15(a)).

37.     Defendants' previous failures did not go unnoticed and Defendants had ample warnings and saw sufficient red flags to have acted to protect the Company and improve internal controls. In 2019, the Company was ordered to pay a civil money penalty of $100,000 to the SEC and the SEC instituted cease-and-desist proceedings against the Company pursuant to Section 21C of the Securities Exchange Act of 1934.

38.     The Board failed in their fiduciary duties during this time and were not held accountable - Defendant Stone who has served as the Company's CEO from 2014 to present and as a director since 2015 along with Defendants Deutschman (2013 to present); Gyani (2016 to present) and Karish (2013 to present) continue to breach their fiduciary duties while serving on the Company's Board as directors.

**Defendants Allowed the Company to File Numerous False and Misleading Filings with the SEC Regarding its Financial Results and Internal Controls**

39.     During the wrongdoing alleged herein, Defendants allowed the Company to issue false and misleading statements in violation of GAAP and SEC regulations governing the reporting of the Company's financial results and the maintenance of an effective system of internal control

over financial reporting and public disclosures.  This false accounting required a restatement of almost five years of financial statements.

40.     Additionally, the Company issued numerous earnings press releases and quarterly reports and the Board failed in its duty to adequately and properly review and assess the Company's press releases during the period of wrongdoing alleged herein and as a result, the Company violated GAAP standards and SEC rules and regulations.

41.     The false and misleading SEC documents filed by Digital Turbine were red flags that should have warned the Defendants that Digital Turbine's public statements and SEC filings required far more scrutiny by the Board than they had been given.

42.     On August 9, 2021 Digital Turbine issued a press release and announced  its first quarter 2022 financial results.  The press release stated in relevant part:

**Recent Financial Highlights:**

- ***Fiscal first quarter of 2022 revenue totaled $212.6 million***. On a pro forma basis, as if both Fyber and AdColony were owned for the full quarter, total consolidated pro forma revenue for the fiscal first quarter of 2022 was $292.0 million, representing a 104% increase year-over-year as compared to the comparable pro forma figure for the fiscal first quarter of 2021.

*        *        *

**Fiscal 2022 First Quarter Financial Results**

Total revenue for the first quarter of fiscal 2022 was $212.6 million. Total "On- Device Media" revenue, which represents revenue derived from the Company's  Application Media and Content Media platform products, increased 93% year-over-year to $120.3 million. Total "In-App Media" revenue, which represents  revenue derived from the AdColony and Fyber businesses beginning on the dates  when the acquisitions closed during the quarter, was $92.3 million. AdColony contributed $44.9 million during the quarter, while Fyber contributed $49.6 million during the quarter.  On a pro forma basis, as if both Fyber and AdColony were owned for the full quarter, total consolidated pro forma revenue for the fiscal first quarter of 2022 was $292.0 million, representing a 104% increase year-over-year as compared to the comparable pro forma figure for the fiscal first quarter of 2021.

43.     The same day, Digital Turbine filed its Form 10-Q with the SEC for the period ended June 30, 2021 (the "1Q22 10-Q"), affirming the previously reported financial results. The report further stated the following as to net revenues and license fees and revenue share:

> Net revenues increased by 264.3% ($155,949) over the comparative periods due to a combination of continuing organic growth of the Company's historical legacy business (On Device Media) and contributions from recent acquisitions.
>
> Costs of revenues and operating expenses increased by 299.8% ($145,634) over the comparative periods, a result of continuing organic and inorganic growth, including the acquisitions of Appreciate, AdColony, and Fyber.
>
> License fees and revenue share increased by 328.3% ($106,048) over the comparative periods, attributable to the increase in net revenues over the same period as these costs are paid as a percentage of our revenues. License fees and revenue share increased at a greater rate over the comparative periods than the associated revenues to which they are tied due to our acquisitions having higher contractual revenue share percentages than the legacy business.

44.     Regarding Digital Turbine's revenue recognition policies, the 1Q22 10-Q stated: "[T]here have been no significant changes to the Company's revenue recognition policies, now inclusive of the acquisitions of AdColony and Fyber . . . ."

45.     Moreover, the 1Q22 10-Q stated: "Based on the evaluation of our disclosure controls and procedures as of the end of the period covered by this Report, our Chief Executive Officer and Chief Financial Officer concluded that, as of such date, our disclosure controls and procedures were effective."

46.     On November 2, 2021, Digital Turbine issued a press release announcing its second quarter 2022 financial results.  The press release stated in relevant part:

**Recent Financial Highlights:**

- Fiscal second quarter of 2022 revenue totaled $310.2 million, representing a 338% increase year-over-year on an as-reported basis and a 63% increase year-over-year as compared to the comparable pro forma figure for the

fiscal second quarter of 2021.

**Fiscal 2022 Second Quarter Financial Results**

Total revenue for the second quarter of fiscal 2022 was $310.2 million. Total "On-Device Media" revenue, which represents revenue derived from the Company's Application Media and Content Media platform products, increased 73% year-over-year to $129.4 million. Before intercompany eliminations, total "In-App Media" revenue, which represents revenue derived from the Fyber and AdColony businesses, increased 61% year-over-year on a pro forma basis to $187.2 million. Fyber contributed $125.7 million during the quarter, while AdColony contributed $61.5 million during the quarter.

47.    The same day, Digital Turbine filed a Form 10-Q with the SEC for the period ended September 30, 2021 (the "2Q22 10-Q"), affirming the previously reported financial results. The report further stated the following as to net revenue and license fees and revenue share, in relevant part:

Over the three-month comparative periods, net revenues increased by 337.6% ($239,312), and over the six-month comparative periods, net revenues increased by 302.5% ($392,915). The changes are due to a combination of continuing organic growth of the Company's historical legacy business (now the On Device Media segment) and contributions from recent acquisitions.

\*        \*        \*

Over the three and six months ended September 30, 2021, total costs of revenues and operating expenses increased by $234,896 and $379,976, respectively, compared to the three and six months ended September 30, 2020. The increase in total costs of revenues was a result of continuing organic growth and the acquisitions of Appreciate, AdColony, and Fyber.

\*        \*        \*

License fees and revenue share increased by $172,613 to $213,145 in the three months ended September 30, 2021, and were 68.7% as a percentage of total net revenues compared to $40,532 or 57.2% of total net revenues in the three months ended September 30, 2020.

\*        \*        \*

The increase in license fees and revenue share was attributable to the increase in total net revenues over the same period as these costs are paid as a percentage of our revenues. The increase in license fees and revenue share as a percentage of total net revenues was primarily due to our recent acquisitions having higher license fees

and revenue cost percentages, which is largely due to contractual revenue share percentages that are higher than the legacy business.

48.     Regarding Digital Turbine's revenue recognition policies, the 2Q22 10-Q stated: "[T]here have been no significant changes to the Company's revenue recognition policies, now inclusive of the acquisitions of AdColony and Fyber . . . ."

49.     Moreover, the 2Q22 10-Q stated: "Based on the evaluation of our disclosure controls and procedures as of the end of the period covered by this Report, our Chief Executive Officer and Chief Financial Officer concluded that, as of such date, our disclosure controls and procedures were effective."

50.     On February 8, 2022, Digital Turbine issued a press release announcing its third quarter 2022 financial results.  The press release stated the following in relevant part:

**Recent Financial Highlights:**

- Fiscal third quarter of 2022 revenue totaled $375.5 million, representing a 324% increase year-over-year on an as-reported basis and a 38% increase year-over-year as compared to the comparable pro forma figure for the fiscal third quarter of 2021.

*          *          *

**Fiscal 2022 Third Quarter Financial Results**

Total revenue for the third quarter of fiscal 2022 was $375.5 million. Total "On-Device Media" revenue, which represents revenue derived from the Company's Application Media and Content Media platform products before intercompany eliminations, increased 43% year-over-year to $133.6 million. Before intercompany eliminations, total revenue from our two "In-App Media" segments, which represents revenue derived from the Fyber and AdColony businesses, increased 40% year-over-year on a pro forma basis to $251.7 million. Fyber contributed $157.4 million during the quarter, while AdColony contributed $94.3 million during the quarter.

51.     The same day, Digital Turbine filed its Form 10-Q with the SEC for the period ended December 31, 2021 (the "3Q22 10-Q"), affirming the previously reported financial results.   It further stated regarding net revenues and license fees and revenue share, in relevant part:

> Over the three-month comparative periods, net revenues increased by 323.8% ($286,894), and over the nine-month comparative periods, net revenues increased by 311.1% ($679,809). The changes are due to a combination of continuing organic growth of the Company's historical legacy business (now the On Device Media segment) and contributions from recent acquisitions.
>
> *          *          *
>
> License fees and revenue share increased by $217,578 to $267,722 in the three months ended December 31, 2021, and was 71.3% as a percentage of total net revenue compared to $50,144, or 56.6% of total net revenue, for the three months ended December 31, 2020.
>
> *          *          *
>
> The increase in license fees and revenue share was attributable to the increase in  total net revenue over the same period as these costs are paid as a percentage of our  revenue. The increase in license fees and revenue share as a percentage of total net revenue was primarily due to our recent acquisitions having higher license fees and  contractual revenue cost percentages compared to the legacy business.

52.     Regarding Digital Turbine's revenue recognition policies, the 3Q22 10-Q stated: "[T]here have been no significant changes to the Company's revenue recognition policies, now inclusive of the acquisitions of AdColony and Fyber . . . ."

53.     Moreover, the 3Q22 10-Q stated: "Based on the evaluation of our disclosure controls and procedures as of the end of the period covered by this Report, our Chief Executive Officer and Chief Financial Officer concluded that, as of such date, our disclosure controls and procedures were effective."

54.     The above statements were materially false and/or  misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects.  Defendants approved

and allowed the Company to issue the SEC filings that failed to disclose: (1) that the Company's recent acquisitions, AdColony and Fyber, act as agents in certain of their respective product lines; (2) that, as a result, revenues for those product lines must be reported net of license fees and revenue share, rather than on a gross basis; (3) that the Company's internal control over financial reporting as to revenue recognition was deficient; and (4) that, as a result of the foregoing, the Company's net revenues was overstated throughout fiscal 2022 and Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

**Digital Turbine Disclosed It Would Restate Its Financial Statements**

55.     On May 17, 2022 Digital Turbine disclosed that it would restate its financial statements for the periods ended June 30, 2021, September 30, 2021, and December 31, 2021 following a review of the presentation of revenue net of license fees and revenue share for the Company's recently acquired businesses. The press release further stated in relevant part:

> The revenue for certain product lines of the recently acquired businesses, which are separate reportable segments, will now be reported net of license fees and revenue share, rather than on a gross basis, as had been previously reported. The changes have the offsetting effect of decreasing both revenue and license fees and revenue share in a like amount, while simultaneously increasing reported gross profit margin and Non-GAAP Adjusted EBITDA margin, in the interim financial statements for each relevant period.

56.     On May 17, 2022, Digital Turbine filed a Form 8-K revealing preliminary estimates of the extent of the restatement. Specifically, the 8-K stated in relevant part:

> Accordingly, May 11, 2022, the management and the Audit Committee of the Board of Directors (the "Audit Committee") of the Company concluded that (a) the Company will restate its financial statements for the three-month period ended June 30, 2021, three and six-month periods ended September 30, 2021, and three and six-month periods ended December 31, 2021 (the "Relevant Periods"), and (b) the Company's previously issued unaudited interim consolidated financial statements for the Relevant Periods included in its quarterly report on Form 10-Q for each of the Relevant Periods, as originally filed with the Securities and Exchange

Commission on August 9, 2021, November 2, 2021, and February 8, 2022, respectively, should no longer be relied upon.

In connection with the integration of the Company's recently acquired businesses (AdColony Holding AS and Fyber N.V. (the "Acquired Companies")), management performed a review of the presentation of revenues and license fees and revenue share based on the accounting guidance for revenue recognition, including considerations of principal and agent (or "gross and net") presentation. After a detailed review of the Acquired Companies product lines and related contracts with customers and publishers, the Company concluded that each Acquired Company acts as an agent in certain of their respective product lines and, as a result, the revenues for those product lines should be reported net of license fees and revenue share. Previously, all revenues of the Acquired Companies, which are reported as separate segments referred to as In App Media – AdColony and In App Media – Fyber, respectively, were reported on a gross basis.

Previously, the Company's revenues were reported as approximately $212.6 million for the three-month period ended June 30, 2021, $310.2 million for the three-month period ended September 30, 2021, and $375.5 million for the three-month period ended December 31, 2021. Based on its preliminary assessment, the Company expects that revenue on a net basis will be reported as approximately $158.1 million for the three-month period ended June 30, 2021, $188.6 million for the three-month period ended September 30, 2021, and $216.8 million for the three-month period ended December 31, 2021.

57.     The same Form 8-K revealed that "the Company's disclosure controls and procedures were not effective at June 30, 2021, September 30, 2021, and December 31, 2021."

58.     On this news, the Company's shares fell $1.93, or 7.1%, to close at $25.28 per share on May 18, 2022.

### Defendants Allowed the Company to File Numerous False and Misleading Filings with the SEC Regarding its Financial Results and Internal Controls

59.     During the wrongdoing alleged herein, Defendants allowed the Company to issue false and misleading statements in violation of GAAP and SEC regulations governing the reporting of the Company's financial results and the maintenance of an effective system of internal control over financial reporting and public disclosures.  This false accounting required a restatement of almost five years of financial statements.

60.     Additionally, the Company issued numerous earnings press releases and quarterly reports and the Board failed in its duty to adequately and properly review and assess the Company's press releases during the period of wrongdoing alleged herein and as a result, the Company violated GAAP standards and SEC rules and regulations.

61.     The false and misleading SEC documents filed by Digital Turbine were red flags that should have warned the Defendants that Digital Turbine's public statements and SEC filings required far more scrutiny by the Board than they had been given.

## DERIVATIVE AND DEMAND FUTILITY
## <u>ALLEGATIONS FOR THE BOARD OF DIGITAL TURBINE</u>

62.     Plaintiff incorporates by reference all preceding and subsequent paragraphs as though they were fully set forth herein.

63.     Plaintiff brings this action derivatively  on behalf of Digital Turbine to redress injuries already suffered and injuries that continue to be suffered  as a direct and proximate result of the misconduct alleged herein. Digital Turbine  is named as a nominal Defendant solely in a derivative capacity.

64.     Plaintiff will fairly and adequately represent the interests of the Company in enforcing and prosecuting its rights.

65.     Plaintiff did not make a demand on the Board to take remedial  action on behalf of Digital Turbine against its own members because such a demand  would have been a futile, wasteful and useless act.

**Demand Is Futile Because a Majority of the Board Could Not Have Exercised Disinterested and Independent Business Judgment in Considering the Demand.**

66.     At the time of this filing, Digital Turbine's Board consists of eight members – Defendants Deutschman, Chestnutt, Groos, Gyani, Karish, Sterling, Spilman and Stone (the "Director Defendants").

67.     The Board exhibited a sustained and systematic failure to fulfill their fiduciary duties by actively participating or acquiescing in the wrongdoing alleged herein and/or by failing to implement adequate internal controls and procedures necessary to reasonably assure that the wrongdoing alleged herein did not occur.  Such failures could not have been an exercise of good faith business judgment.

68.     The failures of Digital Turbine's controls and procedures, and the errors they produced, are red flags that should have alerted the Board  that the Company was releasing information to the  public that was false  and  misleading,  and  that there needed  to  be  much  more  stringent oversight  of  the  information being released to the public.

69.     Despite these red flags, Digital Turbine continued to release false  and  misleading information.  Such failure for the Board to act, when an affirmative duty to act has materialized, shows a lack of a good faith effort to be informed and  to exercise judgment.

**Substantial Likelihood of Liability for the Entire Board of Directors**

70.     Defendants face a substantial likelihood of liability in this action because of their admitted failure, as directors and/or officers, to assure that a reliable system of financial controls was in place and functioning effectively.  The dramatic breakdown and gaps in those controls were so widespread and systematic that the entire Board faces substantial exposure of liability.

71.     Furthermore, Defendants acted in bad faith by breaching their fiduciary duties in failing to adequately manage and oversee the Company which has, as alleged herein, severely impacted the Company's financial condition and future prospects.

72.     By failing to satisfy their fiduciary duties, Defendants caused irreparable reputational harm to the Company, exposed the Company to millions of dollars of liability in securities class action lawsuits, and have potentially threatened Digital Turbine's ability to exist in the future.  Defendants caused or allowed Digital Turbine to mislead its shareholders and the general public.

73.     Each Director Defendant had a duty to diligently evaluate information provided to the Board by management and to ensure that reasonable systems of reporting existed that all relevant information, including but not limited to information regarding the Company's business, its revenues, classification of expenses and the veracity of the Company's financial disclosures and projections.  Director Defendants either evaluated this information and intentionally or recklessly rubber-stamped Digital Turbine's misrepresentations, or recklessly failed to ensure the disclosure of information necessary to prevent the statements from being materially false and misleading.

74.     Each of the Director Defendants face a substantial likelihood of liability in this action because of his/her failure, as a director, to assure that reliable systems of controls were implemented and functioning effectively to prevent the Company from issuing materially misleading statements. Based on the size, scope, and blatancy of the wrongdoing, the Individual Defendants must have known, or were reckless in not knowing, that the statements disseminated during the Relevant Period were materially misleading and/or omitted material information necessary not to make the statements materially misleading.  Accordingly, Director Defendants face substantial exposure to liability for their total abrogation of oversight.

75.     Furthermore, Defendants Stone, Deutschman, Gyani and Karish face additional liability as each served on the Board (Stone also served as the Company's CEO) and facilitated the Company's ongoing violations of securities in connection with the Company's failure to create and implement effective internal control over financial reporting for ***seven consecutive annual reporting***

*periods* from fiscal years 2011-2017 which ultimately resulted in the Company paying a monetary penalty to the SEC.

76.     Because each of the Director Defendants face a substantial likelihood of liability for their unexculpated breaches of duty, demand is excused.

**Additional Likelihood of Liability for the Audit Committee Members**

77.     Defendants Deutschman, Chestnutt and Groos (who served as served as the Chair person during the time when the Company' restated its financials) were, during the period of wrongdoing, members of the Audit Committee of the Company's Board.  The Audit Committee is responsible, by its Charter, for preparing, reviewing, and discussing Digital Turbine's financial statements with management and the independent auditors.  The Audit Committee is also responsible for discussing Digital Turbine's operation of internal controls.  Thus, the Audit Committee was responsible for overseeing and directly participating in Digital Turbine's financial reporting process.

78.     However, Defendants Deutschman, Chestnutt and Groos breached their fiduciary duties of due care, loyalty, and good faith because the Audit Committee caused or allowed the Company to issue false and misleading statements; failing to identify, detect, and prevent material misstatements in the Company's SEC filings; and failing to put in place or maintain proper internal controls. disclose material facts to shareholders during the Relevant Period.  These Defendants authorized the issuance of Digital Turbine's SEC filings and financial releases, which contained materially false and misleading statements about the Company's existing business, business potential, and financial future.  As members of the Audit Committee, Defendants Deutschman, Chestnutt and Groos were directly involved in preparing or reviewing such materially false and misleading statements.  Thus, Defendants knowingly or recklessly issued materially false and misleading statements that conflicted with facts known by them at that time.

79.     Furthermore, Defendants Groos and Deutschman are each considered an "audit commit financial expert" as defined by the SEC.

80.     Indeed, the Audit Committee wholly abdicated their responsibilities to the Company and its shareholders by failing to adequately supervise the statements made during the Relevant Period.  Because of this abdication, the Company is exposed to significant legal costs as a result of its violations of governing securities laws.  Moreover, the Audit Committee's failures took place despite their explicit, particularized duty to ensure the Company's compliance with all federal and state laws.

**The Board Failed to Institute Sufficient Internal Controls and to Assure Truthful Representations**

81.     Under applicable law, all of the directors were responsible for overseeing the integrity of Digital Turbine's accounting and financial statements and its public statements and SEC filings. The Board members reviewed and approved of the various public communications complained of herein, and had to have been alerted to the misstatement contained therein and omissions therefrom, and had to have been alerted to their materially false and misleading nature.

82.     The Company was ultimately forced to admit its internal controls suffered from material deficiencies that rendered them ineffective.  The Board's utter failure to establish and monitor internal controls was at the root of the financial misstatements.

83.     The failures of Digital Turbine's controls and procedures, and the accounting errors they produced, are red flags that should have alerted the Board that the Company was releasing information to the public that was false and misleading, and that there need to be much more stringent oversight of the information being released to the public.

84.     Despite these red flags, Digital Turbine continued to release false and misleading information. Such failure for the Board to act, when an affirmative duty to act has materialized, shows a lack of good faith effort to be informed and exercise judgment.

85.     Given that a majority, if not all, of the current Board failed to fulfill its most basic fiduciary duties, a majority of the Board is far too directly and specifically involved in the misconduct alleged herein to be able to reasonably or in good faith evaluate a demand to investigate their own misconduct, a pre-suit demand.

**Defendant Stone Lacks Independence as the Company's CEO**

86.     Defendant Stone's livelihood depends on the substantial monetary and other compensation he receives from the Company.  Because of Stone's employment with the Company, he is not considered an independent director.

**COUNT I**
**Against All Individual Defendants for Breach of Fiduciary Duty**

87.     Plaintiff incorporates by reference and realleges each and every allegation set forth above as if set forth full herein.

88.     The Individual Defendants, by reason of their positions as officers  and directors of Digital Turbine and because of their ability to control the business  and corporate affairs of Digital Turbine, owed Digital Turbine fiduciary obligations  of due care and loyalty,  and were and are required to use their utmost ability to  control and manage Digital Turbine in a fair, just, honest, and equitable manner.

89.     Each of the Individual Defendants violated their fiduciary duties by consciously failing to prevent the Company from engaging in the unlawful acts  complained of herein. The

Individual Defendants repeatedly encouraged and/or acquiesced in unlawful and unethical behavior throughout the Company's business operations.

90.     The Individual Defendants either knew, were reckless, or were grossly negligent in disregarding the illegal activity alleged herein. The Individual Defendants either knew, were reckless, or were grossly negligent in not knowing that Digital Turbine lacked effective disclosure controls and internal controls over financial reporting throughout its business and operations, which had subjected the Company's financial information to numerous errors and misstatements.

91.     The Individual Defendants' misconduct was not due to an honest error in judgment, but rather their bad faith and was done knowingly, willfully, intentionally or recklessly.

92.     Accordingly, the Individual Defendants breached their fiduciary duties to the Company.

93.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Digital Turbine has sustained significant damages, as alleged herein, including without limitation, the precipitous decline in Digital Turbine's value following the public disclosure of the wrongful acts complained of herein.

94.     Plaintiff, on behalf of Digital Turbine, has no adequate remedy at law.

## COUNT III

### Against Defendants Marsh and Middleton for Contribution
### Under Sections 10(b) and 21D of the Exchange Act

95.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

96.     Digital Turbine and Defendant Stone are named as defendants in the Securities Class Actions, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company

is found liable in the Securities Class Actions for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendant Stone's willful and/or reckless violations of his obligations as officers and/or director of Digital Turbine.

97.     Defendant Stone, because of his position of control and authority as CEO of Digital Turbine, respectively, was able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Digital Turbine, including the wrongful acts complained of herein and in the Securities Class Actions.

98.     Accordingly, Defendant Stone is liable under 15 U.S.C. § 78j(b),which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

99.     As such, Digital Turbine is entitled to receive all appropriate contribution or indemnification from Defendant Stone.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment on behalf of Digital Turbine against the Defendants, jointly and severally, as set forth herein as follows:

a)     Declaring that Plaintiff may maintain this action on behalf of Digital Turbine, and that Plaintiff is an adequate representative of the Company;

b)     Declaring that the Individual Defendants breached and/or aided and abetted the breach of their and other members of the Board's fiduciary duties to Digital Turbine;

c)     Determining and awarding to Digital Turbine the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereof;

d)      Directing Digital Turbine and the Individual Defendants to take all necessary  actions to reform and improve Digital Turbine's corporate governance and internal procedures to  comply with applicable laws and to protect Digital Turbine and its shareholders from a repeat of the  damaging events described herein;

e)      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs and expenses; and

f)      Granting such other and further relief as the Court may deem just and  proper.

DATED: September 9, 2022

Respectfully Submitted,


/s/ *William B. Federman*
William B. Federman, Esq. (TX Bar #00794935)
FEDERMAN & SHERWOOD
10205 N. Pennsylvania Avenue
Oklahoma City, OK 73120
Phone: (405) 235-1560
Fax: (405) 239-2112
wbf@federmanlaw.com
-and-
212 W. Spring Valley Road
Richardson, TX 75081


*Attorneys for Plaintiff*

## **VERIFICATION**

I, <u>Theodore William Olszanski</u> declare that I have reviewed the Complaint ("Complaint") prepared on behalf of Digital Turbine, Inc., and I authorize its filing.  I have reviewed the allegations made in the Complaint, and to those allegations of which I have personal knowledge, I believe those allegations to be true.  As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and for that reason believe them to be true.  I further declare that I am a current holder and have been a continuous holder of Digital Turbine, Inc common stock during the relevant time period in which the wrongful conduct alleged and complained of in the Complaint was occurring.


<u>September 6,</u> , 2022

Date

<u>*Ted Olszanki*</u>

(Signature of Investor)